UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER CASTAGNA and GAVIN CASTAGNA, <br><br> Plaintiffs, <br><br> v. <br><br> DARAN EDWARDS, ANTHONY TROY, JAY TULLY, KAMAU PRITCHARD, MICHAEL BIZZOZERO, KEITH KAPLAN, and HARRY JEAN, Individually, <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * Civil Action No. 15-cv-14208-IT <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

MEMORANDUM & ORDER
January 17, 2019

TALWANI, D.J.

After a jury found in favor of all Defendants as to all claims, Plaintiffs Christopher Castagna and Gavin Castagna moved for a new trial, asserting that: (1) the jury verdict on the 42 U.S.C. § 1983 unlawful entry claim against Defendants Daran Edwards, Keith Kaplan, and Harry Jean is against the law and against the weight of the credible evidence; (2) the jury was improperly instructed on probable cause to arrest Plaintiffs for disorderly conduct and disturbing the peace; and (3) defense counsel improperly argued in her closing that Christopher Castagna was racist and that the court's supplemental jury instruction was insufficient to cure the prejudice, thus warranting a new trial on all claims. Pls.' Mot. New Trial at 1-2 [#292]. Finding that relief is not merited under the second and third argument, but that the verdict is against the law as to the warrantless entry into the home and that the warrantless entry on the facts at trial is not protected by qualified immunity, Plaintiffs' motion is ALLOWED as to the § 1983 unlawful entry claim against Defendants Edwards, Kaplan, and Jean, but is otherwise DENIED.

1

I.  STANDARD

"A district court may set aside the jury's verdict and order a new trial only if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice." Casillas-Diaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006). In considering the weight of the evidence, the court views the evidence in the light most favorable to the non-moving party. Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 764 (1st Cir. 1996).

II.  THE UNLAWFUL ENTRY CLAIM

A.  The Evidence at Trial

The events leading up to Defendants Edwards, Kaplan and Jean's entry to the apartment were, for the most part, not in dispute.

On March 17, 2013, Plaintiffs and most of the non-police witnesses spent the day enjoying various Saint Patrick's Day festivities in South Boston, eventually arriving at Christopher Castagna's first-floor apartment on East 6th Street. Defendants, all Boston Police Officers, spent the day patrolling the Saint Patrick's Day parade route, and after that, responding to party calls.

At 5:54 p.m., a 911 caller reported a loud party at the intersection of East 6th Street and O Street in South Boston. According to the caller, the party participants were "whipping" beer bottles off the second-floor porch, which faced 6th Street. Officer Kaplan did not hear the 911 call, but he received notice from dispatch of a disturbance and the street intersection where the party was located.

Around 7:29 p.m., when police officers, including Kaplan, Edwards, and Jean, approached East 6th Street and O Street, the only apartment with music and yelling was a first-floor apartment on 6th Street, later identified as Christopher Castagna's apartment. Officer Kaplan observed several people leave the apartment and other people inside drinking and

2

dancing. Detective Jean observed what appeared to be someone vomiting on the sidewalk outside of the apartment. Detective Edwards heard loud music as he approached the apartment.

According to the officers, the front door of the apartment was open. (Although Plaintiffs attempted to show that the temperature was too cool for the door to be open, there was no dispute that people were entering and exiting the apartment, and there was no direct evidence to contradict the officers' assertion that at the moment they arrived, the door was ajar). Officer Kaplan stepped into the apartment first and yelled "hello" and "Boston Police" into the apartment. No one answered right away. Without asking for permission, Officer Kaplan and Detectives Edwards and Jean walked into the apartment. At this point, the people inside the apartment stopped dancing, turned down the music, and walked over towards Officer Kaplan.

Officer Kaplan testified that when he entered the apartment, his objective was to get the attention of the homeowners and to tell them to keep the doors shut and the noise down. Officers Edwards and Jean also testified that their objectives were to contact the owner and ask him to turn the music down. Officer Kaplan and Detective Jean further testified that they had no intention of arresting anyone at the party.

After entering, the officers inquired about where the homeowners were. Some guests told the officers that the owner of the apartment, Christopher Castagna, was down the hall, in the bathroom. While Officer Kaplan and Detective Edwards stayed in the kitchen speaking to the guests, Detective Jean and another officer, Terry Cotton, walked down the hall.

B. The Officers' Entry Was Unlawful and Was Not Protected by Qualified Immunity

Plaintiffs argue that the entry of Officer Kaplan and Detectives Edwards and Jean into Plaintiffs' home and Christopher Castagna's bedroom was not supported by a warrant or exigent circumstances, and was not entitled to qualified immunity. Pls.' Mem. Supp. Mot. New Trial ("Pls.' Mem.") at 8-12 [#293]. Defendants respond that exigent circumstances did exist and

3

moreover, that the officers' actions were justified by an exception to the warrant requirement for police officers engaging in community caretaking functions. Defs.' Opp. Pls.' Mot. New Trial ("Defs.' Opp.") at 11-14 [#298]. Defendants further argue that the officers are also entitled to qualified immunity due to the unsettled nature of the community caretaking exception in 2013, at the time of the entry. Id. at 16.

   1. *The Officers' Entry Was Unlawful*

The Fourth Amendment shields individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "It is common ground that a man's home is his castle and, as such, the home is shielded by the highest level of Fourth Amendment protection." Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015) (citing United States v. Martin, 413 F.3d 139, 146 (1st Cir. 2005)). "'A warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well-delineated exceptions' to the Fourth Amendment's warrant requirement." Id. (quoting United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004)).

   a.   Exigent Circumstances

The well-delineated exceptions offered for exigent circumstances include: "(1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [themselves]." Hegarty v. Somerset Cty., 53 F.3d 1367, 1374 (1st Cir. 1995) (citing Minnesota v. Olsen, 495 U.S. 91, 100 (1990)). "[A] subset of the exigent circumstances rubric covers 'emergency aid.'" Matalon, 806 F.3d at 636. Within this emergency aid exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City v. Stuart, 547 U.S. 398, 403 (2006). "[A] cognizable exigency must present a 'compelling necessity for

4

immediate action that w[ould] not brook the delay of obtaining a warrant.'" Hegarty, 53 F.3d at 1374 (quoting United States v. Almonte, 952 F.2d 20, 22 (1st Cir. 1991)). Thus, in an emergency situation, police "'may enter a residence without a warrant if they reasonably believe that swift action is required to safeguard life or prevent serious harm.'" Matalon, 806 F.3d at 636 (quoting United States v. Martins, 413 F.3d 139, 147 (1st Cir. 2005)).

At the hearing on the pending motion, Defendants argued that the officers properly entered the apartment without a warrant due to a concern for safety of underage party goers. The weight of the evidence does not support this claim of a concern for the safety of underage party goers, let alone a need for emergency assistance. Although Detective Jean testified that he saw someone vomiting twice outside of the apartment, he also admitted that he did not look for or inquire inside about the person who vomited. No other officer testified that they observed any vomiting inside or outside of the apartment. Prior to entering the apartment, none of the officers observed anything remarkable about the scene in the apartment; Officer Kaplan testified that he observed people dancing and Detective Edwards testified that he observed people chatting and drinking from cups.

During the trial, none of the officers articulated any concern as to an emergency need to enter. Nor did the officers articulate a specific safety concern other than the possibility that the party goers may have been underage, and as to that concern, none of the officers testified to asking any party goers their age or for identification. Officer Kaplan testified that upon entering the home, the guests were cooperative. None of the officers testified that the anyone tried to run or hide from the officers to avoid detection. Cf. Howes v. Hitchcock, 66 F. Supp. 2d. 203, 208-215 (D. Mass. Sept. 9, 1999) (finding that officers are entitled to qualified immunity for entering house after monitoring underage party outside, announcing police presence at the entryway, and observing teenagers run to basement and climb out of bedroom window to escape detection).

5

Furthermore, all three men testified that they were responding to a noise complaint and that their primary objective in entering the home was to find the owner and ask him to turn down the music. In Commonwealth v. Kiser, 48 Mass. App. Ct. 647 (2000), like here, the police officers entered a home without a warrant when responding to a noise disturbance complaint. Id. at 649. As the court explained there, "[t]his situation does not involve the degree of exigency needed to bypass the Fourth Amendment." Id. at 651-652. Thus, the officer's actions do not fall within the exigent circumstance exception.[1]

        b.    *Community Caretaking Exception*

Defendants also argue that the search was appropriate as a "community caretaker" search because the search was "totally divorced from criminal investigation activity." Defs.' Mem. at 12 [298]. The court rejected this argument when Defendants asked for a "community caretaker" instruction for the jury and rejects the argument again here.

This exception to the warrant requirement for searches "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" has been allowed by the United States Supreme Court as to cars. Cady v. Dombrowski, 413 U.S. 433, 441, 447-48 (1973); see also United States v. Rodriguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991) ("[b]ecause of the ubiquity of the automobile . . . and the automobile's nature . . . the police are constantly faced with dynamic situations . . . in which they, in the exercise of their community caretaking function, must interact with car and driver to promote public safety."). In

---

[1] Defendants also argue that their actions qualify as exigent circumstances under Commonwealth v. Tobin, 108 Mass. 426 (1871) and Ford v. Breen, 173 Mass. 52 (1899). Defs.' Mem. at 13 [#298]. The Massachusetts Court of Appeals addressed the two cases in Kiser, noting that "[it] is true that two earlier Massachusetts cases decided in the late nineteenth century upheld an officer's right to enter a home without a warrant to quell a breach of the peace, but the noise that precipitated the officers' entries in those cases was that of violent fighting, with the attendant fear that someone inside was in physical danger." 48 Mass. App. Ct. at 651.

6

performing this community caretaking role, a police officer is "'a jack-of-all emergencies,' . . . expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect public safety." Id. at 784–85 (1st Cir. 1991) (internal citation omitted).

In the 45 years since Cady, the First Circuit has declined to directly address claims of a community caretaking exception for searches of homes, but also has not endorsed such an exception. In United States v. Tibolt, 72 F.3d 965 (1st Cir. 1995), where the court did not need to reach the issue after finding exigent circumstances permitted the warrantless entry, the court responded to the government's request to characterize the warrantless entry as a "so-called 'community caretaker'" exception, with a citation to Cady's note of the "'constitutional difference' between search of home and search of automobile." Id. at 969 n.2 (quoting Cady, 413 U.S. at 439). The Tibolt court also listed decisions from three other circuits finding that Cady applied only to searches of automobiles and not homes. Id. (citing United States v. Bute, 43 F.3d 531, 535 (10th Cir. 1994); United States v. Erickson, 991 F.2d 529, 532 (9th Cir. 1993); United States v. Pichany, 687 F.2d 204, 209 (7th Cir. 1982)).[2]

These circuits have since been joined by the Third Circuit in Ray v. Township of Warren, 626 F.3d 170 (3rd Cir. 2010), where the court "agree[d] with the conclusion[s] of the Seventh, Ninth, and Tenth Circuits on this issue, and interpret[ed] the Supreme Court's decision in Cady as being expressly based on the distinction between automobiles and homes for Fourth Amendment purposes." Id. at 177; see also id. at 175 (noting that the Supreme Court "expressly distinguished" the searches, noting that a "search of a vehicle may be reasonable 'although the

---

[2] The First Circuit has declined on two more occasions to endorse or reject application of the community caretaking exception to police activities involving a person's home. See MacDonald v. Town of Eastham, 745 F.3d 8, 13 (1st Cir. 2014) and Matalon v. Hynnes, 806 F.3d 627, 634 (1st Cir. 2015). Both cases are discussed below in the section on qualified immunity.

7

result might be the opposite in a search of a home.'") (quoting Cady, 413 U.S. at 440). That distinction "recognizes that the sanctity of the home 'has been embedded in our tradition since the origins of the Republic.'" Id. (quoting Payton v. New York, 445 U.S. 573, 601 (1980)).

And as the Third Circuit explained, while the Sixth and Eighth Circuits have referenced a community caretaking exception, their analyses appear to actually use a "modified exigent circumstances test." Id. at 176 (citing United States v. Quezada, 448 F.3d 1005 (8th Cir. 2006) (holding "that an officer acting in a community caretaking role may enter a residence when the officer has a reasonable belief that an emergency exists that requires attention") and United States v. Rohrig, 98 F.3d 1506, 1519 (6th Cir.1996) (holding that "ongoing and highly intrusive breach of a neighborhood's peace in the middle of the night constitutes exigent circumstances justifying warrantless entry")); see also United States v. Williams, 354 F.3d 497, 508 (6th Cir. 2003) ("[D]espite references to the doctrine in Rohrig, we doubt that community caretaking will generally justify warrantless entries into private homes.").

In sum, Defendants' claim that they are entitled under the law to enter an occupied home, without a warrant or consent, to find the owner to have him turn down the music, simply because they were not involved in criminal investigation activity, is supported by neither case law nor reason.

### 2. *The Officers' Entry Was Not Protected by Qualified Immunity*

Defendants argue that they are protected from liability for the entry under the doctrine of qualified immunity. Defs.' Mem. at 14-16 [#298]. For qualified immunity to apply, the court must explore "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged conduct." Matalon, 806 F.3d at 633 (quotations and citations omitted). Defendants fail the first prong, as detailed above. The court turns here to the second prong and

finds the right at issue to be clearly established at the time of Defendants' warrantless entry into Plaintiffs' home.

Defendants rely on the First Circuit's decision in MacDonald, where the court stated that "'the reach of the community caretaking doctrine is poorly defined' outside of the motor vehicle milieu," that the court "'has not decided whether the community caretaking exception applies to police activities involving a person's home,'" and that the First Circuit's "survey of the case law revealed that 'the scope and boundaries of the community caretaking exception [were] nebulous.'" Defs.' Mem. at 14-15 [#298] (quoting MacDonald, 745 F.3d at 13-14). Moreover, Defendants note, the First Circuit concluded that "'neither the general dimensions of the community caretaking exception nor the case law addressing the application of that exception provides the sort of red flag that would have semaphored to reasonable police officers that their entry into the plaintiff's home was illegal.'" Id. (quoting MacDonald, 745 F.3d at 15). Defendants' reliance on the First Circuit's comments on the poorly defined reach of the doctrine outside of the automobile context, without consideration of the specific facts at issue in that case or here, suggests that, in their view, officers are immune from all entry and search of an occupied home so long as the officer is not engaged in criminal investigation and claims instead a "community caretaking" function. The court disagrees.

Although the First Circuit did find the officers' entry into the home in MacDonald to be protected by qualified immunity, the facts in MacDonald were quite different than those here. In MacDonald, police officers responded to a call from a citizen concerned about a neighbor's front door standing wide open. 745 F.3d at 10. The police officers first interviewed the citizen, then approached the neighbor's home, announced their presence, and entered the home only after receiving no response. Id. The entry and search of a home with an open door and no response from any inhabitant was taken "to ensure that nothing was amiss." Id. at 14. As the court noted,

9

"given the parade of horribles that could easily be imagined had the officers simply turned tail, a plausible argument can be made that the officers' actions were reasonable under the circumstances." Id. The language concerning the absence of a "red flag" followed the court's discussion of cases in other states finding the community caretaking exception applicable on facts, similar to those in MacDonald, involving the entry of homes where doors were open, no occupants responded to the officers' inquiry, and there were true safety concerns.

Here, in contrast, while the door was open, the front room was filled with people, and Defendants' reason for entering was to find the owner and have him turn down the music. Even if a plausible argument can be made that the officers' initial step across the threshold of the open door was reasonable as necessary to obtain the partygoers attention, there is no argument that the officers' further entry into the home was reasonable once the partygoers' attention was obtained. Unlike in MacDonald, no "parade of horribles . . .[can] . . . be imagined" if the officers simply had directed the guests to keep the music down or had waited outside for the guests to bring the owner to the door.

The First Circuit again addressed qualified immunity in connection with a community caretaking argument in Matalon. There the court explained that this exception "'requires a court to look at the *function* performed by a police officer' when the officer engages in a warrantless search or seizure." 806 F.3d at 634 (emphasis in original) (quoting Huntsberger v. Wood, 570 F.3d 546, 554 (4th Cir. 2009)). The entry in Matalon involved the pursuit of a robber. Id. at 631. The court found a reasonable officer standing in the defendant's shoes should have known that her warrantless entry while pursuing a fleeing felon in the aftermath of a robbery was not within the compass of the community caretaking exception and that her intrusion into the plaintiff's home abridged his constitutional rights. Id. at 636. As the court explained,

> In sum, the contours of both the plaintiff's right to enjoy the sanctity of his home and the heartland of the community caretaking exception were sufficiently clear to alert [the officer] that her plan of action—a warrantless entry—would infringe the plaintiff's constitutional rights. Put another way, an objectively reasonable officer should have known that a warrantless entry into the plaintiff's home could not be effected on the basis of the community caretaking exception.

Id. at 635. The court underscored that "[t]hough the precise dimensions of the community caretaking exception are blurred, that circumstance does not mean that every attempt to resort to the exception must be regarded as arguable." Id.

Here, an objectively reasonable officer in Defendants' position would have known of Plaintiffs' right to enjoy the sanctity of their home, and moreover, that the function sought to be performed by the police – having the noise turned down at a party – was well beyond the safety or emergency aid function that would arguably fall within any community caretaking exception. Finding otherwise, as another judge in this district has noted, "would be a betrayal of the bedrock principle at the foundation of the Fourth Amendment, the protection of the home." Hutchins v. McKay, 285 F. Supp. 3d. 420, 427 (D. Mass. 2018) (rejecting the officers' qualified immunity argument).

Accordingly, because the weight of the evidence does not demonstrate that Defendants Kaplan, Edwards, and Jean's entry into Christopher Castagna's home falls within an exception to the Fourth Amendment's warrant requirement, this court grants Plaintiffs' request for a new trial as to the 42 U.S.C. § 1983 unlawful entry claim.[3]

## III. PLAINTIFFS' FALSE ARREST CLAIMS

### A. The Evidence at Trial

The events that followed the officers' entry into the home was very much in dispute.

---

[3] In allowing Plaintiffs' motion as to the unlawful entry of the home, the court need not address separately whether Defendants Edwards, Jean, and Kaplan unlawfully entered Christopher Castagna's bedroom, as it is a subset of the same claim.

11

Detective Jean testified that after waiting outside the door of what he understood was the bathroom, he heard noise inside, like people chatting. He knocked on the door, and Christopher Castagna opened it. The room was not a bathroom, but a bedroom, with Christopher Castagna's girlfriend, Samantha Pratt, his friend John Doran, and Gavin Castagna inside of the room.

Detective Jean testified further that after Christopher Castagna opened the door and saw Detective Jean, Christopher Castagna promptly shut the door on Detective Jean's foot. Detective Jean testified that he pushed the door open, and entered the room, and that after he entered the room, Christopher Castagna pushed him. (Christopher Castagna denies being the person who pushed Detective Jean). Officer Kaplan and Detective Edwards testified that they ran to Christopher Castagna's bedroom after they heard yelling and swearing coming from the room.

Detective Jean informed Christopher Castagna that he was under arrest. The officers did not have handcuffs and they requested backup officers to bring handcuffs to the apartment. Detective Jean and Officer Cotton escorted Christopher Castagna from the bedroom into the kitchen area. Before doing so, the officers asked everyone else in the bedroom to leave that room, and Detective Jean told Christopher Castagna to tell the party goers to leave the apartment. When he was brought to the kitchen, rather than asking the party goers to leave, Christopher Castagna instead told everyone to record everything with their phone cameras.

At some point, backup officers, including Anthony Troy, Jay Tully, Kamau Pritchard, and Michael Bizzozero arrived at the apartment with handcuffs. Officers testified that once they obtained handcuffs, Christopher Castagna actively resisted arrest, by stiffening and then flailing his arms; the officers eventually had to pull him to the ground to arrest him. (Christopher Castagna denies resisting arrest). Christopher Castagna was eventually handcuffed, escorted from his apartment, and brought to the police station. He was charged with assault and battery on a police officer, keeper of a disorderly house, and disturbing the peace.

Officers testified further that Gavin Castagna attempted to stop a police officer from arresting another party goer by grabbing the officer's shoulder. Sergeant Troy testified that he grabbed Gavin Castagna, told him to back off, and attempted to place him under arrest, but Gavin attempted to struggle and pulled away from Sergeant Troy. Both Sergeant Troy and Gavin Castagna fell to the ground. Ultimately, other officers assisted in placing handcuffs on Gavin Castagna and he was brought to the police station. Gavin Castagna was initially charged with assault and battery on a police officer and resisting arrest; however, the charges were amended to disturbing the peace and resisting arrest.

    B.  <u>Plaintiffs Are Not Entitled to a New Trial on their False Arrest Claims</u>

Plaintiffs further argue that the court provided incomplete jury instructions as to the elements for disturbing the peace and disorderly conduct, and that these incomplete instructions may have allowed the jury to improperly find probable cause to arrest on these grounds. Plaintiffs. Pls.' Mem. at 13-16 [#293]. Defendants accurately argue that Plaintiffs must demonstrate that the alleged error in instructing the jury affected Plaintiffs' "substantial rights." Defs.' Opp. at 4 [#298]; see <u>Mejias-Aguayo v. Doreste Rodriguez</u>, 863 F.3d 50, 57 (1st Cir. 2017) (quoting <u>Play Time, Inc. v. LDDS Metromedia Commc'ns, Inc.</u>, 123 F.3d 23, 29 n.7 (1st Cir. 2001)). An error "affects 'substantial rights' only if it results in substantial prejudice or has a substantial effect on the outcome of the case." <u>Play Time, Inc.</u>, 123 F.3d at 29 n. 8. The challenged jury instructions, if erroneous, did not affect Plaintiffs' substantial rights because the evidence presented at trial supported the jury's finding that Defendants had sufficient probable cause to arrest.

An arrest is lawful when the arresting officer has probable cause. <u>Tennessee v. Gardner</u>, 471 U.S. 1, 7 (1985). An officer has probable cause, when, at the time of the arrest, the "facts and circumstances within the officers' knowledge . . . are sufficient to warrant a prudent person,

or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). "[A]n officer's state of mind (except for facts that he knows) is irrelevant to the existence of probable cause," and his "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004); United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005). "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" Devenpeck, 543 at 153 (citing Whren v. United States, 517 U.S. 806, 812-13 (1996)).

Detective Jean testified that after opening his bedroom door, Christopher Castagna shoved him from the doorway and shut the door on his foot. Several moments later, after he entered the room, Christopher Castagna pushed Jean again. Another officer, Sergeant Troy, testified that Gavin Castagna interfered with the arrest of another party goer by grabbing the shoulder of the officer attempting to arrest that person. After Sergeant Troy tried to place Gavin under arrest, Gavin resisted arrested by refusing to put his arms behind his back and pushing Troy. These acts alone are sufficient probable cause to arrest. The weight of the evidence thus demonstrates that Defendants had probable cause to arrest Gavin and Christopher Castagna. Plaintiffs' request for a new trial as to the 42 U.S.C § 1983 unlawful seizure and common law false arrest claims is denied.

IV. CLOSING ARGUMENTS

    A. Related Trial Testimony

All but one of the officers who entered the apartment, including the two officers who first entered Christopher Castagna's bedroom, were black, while almost all of the party goers were

white. Christopher Castagna testified that the men who entered his room were "wearing masks" and that he initially thought that he was being robbed. Officer Kaplan testified that when he, the only non-black police officer, entered the room, Christopher Castagna became calmer and spoke to him in a normal level.

The day after the arrests, Gavin Castagna sent and received multiple text messages to friends related to the incident. Their text messages, introduced as Exhibits 75 and 86 at trial, include statements such as, "We all need to meet up sometime in the next few days to go over the events with each other so we can have the story for our lawyers," and "We are getting all our stories together at Chris's right now."

Gavin Castagna's text communications also used derogatory language, including racial slurs, in describing the police officers. In less explicit messages, he stated, "[the police officers] were all huge black cops from the gang unit in Roxbury," "I felt like I was in a rap video," and "Cause black cops hate whites." Gavin Castagna also described the incident as "a matter of race. Black cops beating up white people." Six months later, he still referred to the officers in text messages using racial slurs.

B. Closing Arguments

Plaintiffs object to portions of defense counsel's closing argument, where counsel stated as follows:

> You have seen Chris and Gavin testify in this courtroom. They presented very well. Very polite. Nice suits. But Trial Chris and Trial Gavin are not the real Chris and the real Gavin. Trial Chris and Trial Gavin are not the Chris and Gavin that these officers encountered on March 17, 2013. Real Chris assaults police officers, and Real Gavin is a racist. But that's not a good look when you're trying to get a jury to award you damages, which is why Attorney Klehm told you at the beginning of this case, in his opening statement, that you're going to hear some racially charged language that came from Gavin Castagna, but don't pay attention to that. It's not important. Don't let it distract you. Chris and Gavin don't want you to pay attention to who they really are or what they really did that day because they would prefer that you use your imaginations. And those are not my words.

15

> That is another quote from Gavin. He said, "The video going black is good because it leaves it up to people's imaginations."
>
> And so they have concocted this theory, which Attorney Falkner just called a battle plan, where the police are targeting Gavin and Chris because they're white, where these officers are knocking and punching phones out of people's hands to prevent them from showing their misconduct, where the police are putting on masks and stepping on Chris' neck and saying things like, "They've got cell phones, come in hard." That is not reality. In fact, I think all of these officers would agree that that sounds pretty unreasonable. But none of this stuff happened. This is a fiction that Chris and Gavin have created because, at the end of the day, they don't like that these police officers, especially black police officers, who Gavin refers to as the n-word, were in their home no matter how reasonable of an explanation the officers had to be there.
>
> As Attorney Klehm mentioned in his opening, Chris and Gavin weren't attacking all cops. He made that very clear. It's just something about this group in particular that Gavin and Chris have a problem with. And I submit to you that's because six out of the seven officers who entered that apartment originally were black and that, had Officer Kaplan been the officer to go into the bedroom that evening, we wouldn't be sitting here because, after all, the hostility of this whole incident only begins as a result of Chris and Gavin's initial interaction with Detective Jean.

Tr. Closing Argument, Day 8, 92:25-93:5, 104:18-105:2 [#296].

> Plaintiffs' counsel objected to the closing argument at sidebar:
>
> Your Honor, I'm very concerned about, and I would ask for some kind of instruction. There was no evidence whatsoever that Christopher had any kind of racial motives whatsoever, and it was suggested during the closing argument that Christopher, just like Gavin, was behaving on the basis of race. There was just no evidence that he had any kind of racial motive whatsoever. And I think it was unfair, unfairly prejudicial, and the jury needs to be instructed that there was nothing like that. The general instruction [that lawyers' arguments are not evidence] is not sufficient to cure this.

Defs.' Opp. Ex. A, 111:21-112:7 [#298-1].

Plaintiffs' counsel made no request for a mistrial. He then proceeded with rebuttal, in which he argued to the jury that there was no evidence that Christopher Castagna has any racial prejudice. Id. 115:20-25. The court provided a general instruction to the jury:

16

> Arguments and statements by the plaintiffs' lawyers or the defendants' lawyers are not evidence. What the attorneys say in their opening statements and closing arguments is intended to help you interpret the evidence but it is not evidence.

Id. 126:18-22. The court also provided a curative instruction addressing the text messages.

> I do want to give a further instruction regarding Gavin Castagna's text messages. These text messages were to or from Gavin Castagna, and not Christopher Castagna. There is no evidence that Christopher Castagna made or received any of these messages, and, accordingly, you may not consider these messages in any way in considering Christopher Castagna's actions or statements or in evaluating Christopher's credibility.

Id. 128:25-129:7.

### C. Plaintiffs Are Not Entitled to a New Trial Based on Defendants' Closing Argument

Plaintiffs now argue that it was improper for Defendants' counsel to suggest that Christopher Castagna would not have been hostile had Officer Kaplan, who was white, gone into the bedroom first instead of Detective Jean, who was black. They argue further that the closing arguments unfairly painted Christopher Castagna as a racist, even though only Gavin Castagna had used a racial slur, and that Defendants' counsel left the jury to think that, because of his alleged racism, Christopher Castagna was part of a scheme to create a false story about the actions of the police officers, and that "the claim that the brothers concocted a story about what happened because of the race of some of the officers is unfair and untrue." Pls.' Mem. at 17-20 [#293]. Plaintiffs argue further that the court's curative instruction "constituted plain error," and that the result was a "substantial miscarriage of justice" and requires a new trial as to all claims. Id. at 17-18.

A determination of whether a closing statement was prejudicial depends on the totality of the circumstances, including: "(1) the nature of the comments; (2) their frequency; (3) their possible relevance to the real issues before the jury; (4) the manner in which the parties and the court treated the comments; (5) the strength of the case; and (6) the verdict itself." Mejias-

Aguayo v. Doreste Rodriguez, 863 F.3d 50, 55 (1st Cir. 2017) (quoting Granfield v. CSX Transp., Inc., 597 F.3d 474, 490 (1st Cir. 2010)).

The court starts first with the strength of the case. With or without the closing statement, the evidence strongly supported the officers' version of events. Although the entry was improper as discussed, the evidence at trial was overwhelmingly supported Defendants' version of events. While the witnesses who testified on behalf of the Plaintiffs all claimed that they were not drunk at the time of the events, most conceded that they had been drinking since morning, making their recollection of events far less reliable than otherwise. And as Plaintiffs attempted to piece together what happened and may well have convinced themselves as to the truth of their version, the events they described did not seem credible. For example, while witnesses for Plaintiffs contended that they were assaulted for filming the officers, the jury appears to have found, and the court agrees, that the film footage does not support Plaintiffs' version of events. In another example, friend John Doran testified that he heard Sergeant Troy as Troy was entering the Castagna residence say something to the effect of, "they have their phones out, come in hard." Doran also testified that he saw Brian Feltch, another friend, leaning over the railing near the doorway holding his phone as Sergeant Troy walked into the apartment. Troy testified meanwhile that he was hit in the face with the phone as he entered the apartment. While Feltch may not have intended to hit Troy in his face, Troy's recounting of being hit was far more credible than Doran's testimony that Troy told his officers to "come in hard" because the party goers had cell phones. Similarly, while Christopher Castagna testified that as he was being handcuffed, he was told to shut up and had his necked stepped on by Officer Bizzozero, and while he offered as evidence of this alleged assault, Trial Exhibit 15E, the exhibit only shows Officer Bizzozero looking down, and shows no evidence of this alleged brutal assault. The jury had more than ample reason to credit the officers' version of events.

To the extent that defense counsel argued that Christopher Castagna's perceptions or reactions may have been based on racial stereotyping, there was no error. Christopher Castagna testified that when he first saw Detective Jean at his bedroom door, he believed that he was about to be robbed. Officer Kaplan testified that Christopher Castagna noticeably calmed down when he spoke him as opposed to when Detectives Jean and Edwards, two black police officers, spoke to him. Defendants' closing statement draws a reasonable inference based on these interactions. That Christopher Castagna initially thought the black officers were robbers (but may have understood that they were police officers once the white officer joined the others) is relevant, as it suggests that his perception of what was happening may well have been affected by stereotypes that affect understanding, actions and decisions in an unconscious manner. Defense counsel's comments on such evidence does not amount to a miscarriage of justice.

Throughout the rest of defense counsel's 35-minute closing, defense counsel differentiated as to what the evidence established for each Plaintiff, arguing that "Real Chris assaults police officers, and Real Gavin is a racist." Trial Tr. Day 8, 92:3-4 [#296]. In addressing the text messages, defense counsel argued that they were indicative of Gavin Castagna's state of mind. Id. 103:1-104:1-17 ("What matters is what Gavin thought at the time of the incident, and his text messages speak for themselves.").

To the extent that defense counsel may have inferred anything negative about Christopher Castagna based on Gavin Castagna's text messages, the court provided a curative instruction. Plaintiffs did not object again following the curative instruction or seek a mistrial. See Granfield, 587 F.3d at 490-91; Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 64 (1st Cir 2007) ("The granting of a mistrial is a last resort, and the trial court's usual remedy for an impropriety will be to give a curative instruction.").

In sum, defense counsel's closing did not result in a miscarriage of justice.

V. CONCLUSION

For the foregoing reasons, this court grants Plaintiffs' Motion for a New Trial [#292] as to the 42 U.S.C. § 1983 unlawful entry claim as to Defendants Daran Edwards, Keith Kaplan, and Harry Jean. The motion is otherwise denied.

IT IS SO ORDERED.

Date: January 17, 2019   /s/ Indira Talwani
United States District Judge